## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| QUERENCIA TECHNOLOGIES PTE. LTD., <br><br> Plaintiff, <br><br> v. <br><br> INTERSECT LLC, OSCAR BERMUDEZ, and CHRISTOPHER McCRUM, <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Querencia Technologies Pte. Ltd. ("Querencia") hereby sues Defendants Intersect LLC ("Intersect"), Oscar Bermudez ("Bermudez"), and Christopher McCrum ("McCrum") (collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.      This action arises from a contractual relationship between Querencia and Intersect, by which the principals of the latter, Bermudez and McCrum (collectively, the "Individual Defendants"), fraudulently misrepresented key aspects of the business of Intersect in order to induce Querencia into entering into an agreement to utilize Intersect's bank card processing services, which then gave way to a litany of illicit activities and breaches of contract by Intersect that have now collectively cost Querencia millions of dollars.

2.      Months into the parties' contractual relationship, Querencia discovered that Intersect was manipulating transaction reports to alter the amounts processed for Querencia, in turn preventing Querencia from recouping the full amount of the transactions Intersect processed for Querencia. Moreover, Querencia also learned that Intersect had, among other things: initiated thousands of unauthorized "chargebacks" (*i.e.*, reversals of purchases made with a bank or credit card) for which it then wrongfully assessed Querencia hundreds of thousands of dollars in fees; withheld funds from Querencia by claiming nearly half a million dollars was tied up in nonexistent "investigations" that Intersect later attempted to substantiate with forged documentation; asserted that VISA and Mastercard had assessed $150,000 in fines against Querencia but failed to provide any evidence of same; forged contractual agreements between Querencia and third parties in order to cast off suspicion and avoid responsibility; used third-party intermediaries in Mexico to process Querencia's transactions in contravention of the representations the Individual Defendants made to Querencia that induced Querencia to contract with Intersect; and unilaterally increased the amounts of certain fees and costs in contravention of the parties' contract.

3.      When Querencia confronted Intersect and the Individual Defendants about these highly concerning issues, the Individual Defendants repeatedly assured Querencia that the issues were variously either "system errors," problems of

Querencia's own making, nonexistent, or otherwise unattributable to Intersect. Resultingly, each of the Individual Defendants are equally culpable for inducing Querencia to enter into an agreement with Intersect that, in practice, resulted in a multilayered scheme to defraud Querencia through the manipulation of financial records and the wrongful assessment of fees for made-up infractions that served to siphon away monies belonging to Querencia.

4.    Roughly eight (8) months into the parties' relationship, in July 2024, Intersect failed to remit to Querencia the entire "rolling reserves" that it had previously been caught manipulating to reflect false transaction amounts, and never again responded to Querencia's attempts to communicate with it or its principals. The amount of the rolling reserve at the time was $2,089,983.73, which remains due and owing to Querencia. When factoring in the discrepancies in the transaction reports, unexplained charges and fees, unverified chargebacks, improper fee increases, and other charges that plainly violate the parties' agreement, Querencia has suffered losses directly resulting from Defendants' activities in an amount not less than $3,119,704.31.

## THE PARTIES

5.    Querencia is a company incorporated in Singapore with its principal place of business located at 133 Cecil Street #1401, Keck Seng Tower, Singapore 063595. Querencia markets and sells proprietary AI-driven software platforms

capable of assisting businesses with regulatory compliance, market analysis, and other business needs.

6.    Intersect is a Florida limited liability company with its principal place of business located at 300 South Orange Avenue, Suite 1000, Orlando, Florida 32801. Intersect markets and sells payment processing services for businesses.

7.    Bermudez is an individual residing in the State of Florida with an address of 1523 Sugarwood Circle, Winter Park, Florida 32792. He is a member of Intersect and serves as its Director.

8.    McCrum is an individual residing in the State of New Jersey with an address of 676 Lake Shore Dr., Hewitt, New Jersey 07421. He is a member of Intersect, serves as a Director for Intersect, and appears on Intersect's Annual Reports filed with the Florida Department of State as an Authorized Member.

## JURISDICTION & VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as complete diversity between the parties exists and the amount in controversy, without interest and costs, exceeds seventy-five thousand dollars ($75,000.00). Specifically, Querencia is a foreign entity that maintains its principal place of business in Singapore. Intersect is a citizen of Florida because it is a Florida limited liability company that maintains its principal place of business in Orlando, Florida, whose members are citizens of the states of Florida and New

Jersey.

10.     The Court's exercise of personal jurisdiction over Defendants will not violate traditional notions of fair play and substantial justice, as Bermudez has meaningful and substantial contacts with the state as a citizen thereof, while Intersect similarly has meaningful and substantial contacts because its principal place of business is in this state. The Court also has personal jurisdiction over McCrum, because he engaged in conduct transacted in this state which has given rise to Querencia's claims.

11.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to Querencia's claims occurred in this District and the Defendants are subject to the Court's personal jurisdiction with respect to the claims asserted herein. Furthermore, two (2) of the Defendants—Intersect and Bermudez—are residents of Orange County, Florida, which is located within the Middle District of Florida, Orlando Division.

## GENERAL FACTUAL ALLEGATIONS

12.     Querencia first learned of Intersect by speaking with the owner of Coriunder (a software company that provides payment software for Querencia), who introduced Querencia to Intersect and its principals in early November 2023.

13.     On November 13, 2023, during a meeting over a WhatsApp call between Bermudez, in his capacity as principal and Director of Intersect, and

Querencia's managers, Jerome Schonbachler ("Schonbachler") and Ztiki Fuchs ("Fuchs"), the parties discussed the nature of Intersect's services for the purposes of determining whether Intersect had the ability to provide the particular card payment transaction processing services that Querencia required.

14.    During this meeting, Bermudez represented that if the parties entered into a contractual relationship for the provision of card payment transaction processing services by Intersect for Querencia, such transaction processing services would be processed domestically within the United States. Bermudez further represented that Intersect was an acquirer that was connected directly to banks and not a mere intermediary.

15.    Bermudez further represented the nature of Intersect's services during this meeting, including the various costs and fees that would be associated with each particular type of transaction or other occurrence and the events that would give rise to the imposition of such costs and fees.

16.    In reliance on these representations Bermudez made to Querencia, Querencia entered into a Merchant Services Agreement ("MSA") with Intersect on November 14, 2023. A copy of the MSA is attached hereto as **Exhibit "A."**

17.    One such component of this structure was the calculation and operation of the "rolling reserve," a mechanism that typically accompanies the provision of card payment processing services. At its crux, a rolling reserve is a percentage of a

merchant's gross sales that is withheld by a payment processor for a predetermined period of time after the merchant's sales have been processed and completed, in order to provide the payment processor with a security of sorts in the event of chargebacks, refunds, and other customer disputes. After that predetermined "reserve period" elapses, the withheld amounts are then returned to the merchant.

18.    In the parties' MSA and as represented by Bermudez on November 13, 2023, the rolling reserve was set at 10% of a merchant's gross sales, and the reserve period was set to be 180 days. In other words, Intersect would withhold 10% of the total volume of Querencia's processed card payment transactions for 180 days on an ongoing (*i.e.*, rolling) basis, and then remit the withheld monies back to Querencia as the 180-day reserve period expired.

19.    Moreover, the MSA also outlined various other fees and costs, and stipulates that "[Intersect] will provide written notice to [Querencia] of all amendments" to the rates, fees, costs, and charges delineated in the MSA. This stipulation is consistent with Bermudez's representations on November 13, 2023, wherein he advised Schonbachler and Fuchs that any change to the rates, fees, and costs charged to Querencia would be disclosed, in writing, in advance of any such change.

20.    On April 23, 2024, just five (5) months into the parties' relationship, Querencia discovered material discrepancies between the rolling reserve amounts

depicted on earlier transaction reports provided to Querencia by Intersect and those amounts depicted on later, revised transaction reports provided to Querencia by Intersect. This discrepancy was also displayed on Intersect's online dashboard.

21.    For instance, for the period spanning December 4, 2023, to December 10, 2023, the transaction reports released at that time by Intersect on their online dashboard showed the total dollar amount of Querencia's card transaction settlements processed by Intersect to be $1,646,372.10. Months later, however, reports for that time period now reflected the total amount of card transaction settlements processed by Intersect for Querencia from December 4, 2023, to December 10, 2023, to be only $1,524,022.40—an unexplained discrepancy of $122,349.70.

22.    Notwithstanding Querencia's need to maintain accurate financial records, as well as Intersect's own responsibility as a licensed financial entity to maintain impeccable financial records, this unexplained change significantly impacted the rolling reserves, because the amount of reserves reimbursed to Querencia was calculated as 10% of the total amount of settlements processed by Intersect on its behalf. As a result, this unexplained change artificially lowered the posted settlement totals, resulting in reimbursed rolling reserves that were lower than they should have been.

23.    By way of example, for the period spanning December 4, 2023, to

December 10, 2023, Intersect held rolling reserves calculated on the *original* $1,646,372.10 (*i.e.,* $164,637.21) amount of settlements processed by Intersect, only to then reimburse to Querencia a rolling reserve amount calculated on the *lower* $1,524,022.40 amount of settlements processed by Intersect depicted in the revised reports (*i.e.,* $152,402.24), thereby shortchanging Querencia over $12,000.

24.     When Querencia repeatedly requested a rolling reserve statement—which is commonly utilized in such situations to reconcile certain accounting discrepancies—Intersect refused to provide any such statements and simply advised Querencia to "look at the dashboard."

25.     As Querencia investigated further, it soon realized that this scheme had been occurring throughout the duration of the parties' relationship, with the amounts surreptitiously siphoned away through this after-the-fact manipulation of reports totaling in the hundreds of thousands of dollars.

26.     When Querencia confronted Intersect about the rolling reserve discrepancies arising from the after-the-fact manipulation of reports on April 23, 2024, McCrum, in his capacity as a principal and Director of Intersect and as the individual tasked with constructing financial reports on a weekly basis, acknowledged the discrepancy but sought to gloss over the discrepancy by telling Schonbachler and Fuchs that it was merely a "system error."

27.     McCrum further attempted to mollify Querencia's concerns by

asserting that this "bug" was irrelevant and would not affect Querencia's operations.

28.     In spite of Querencia's repeated demands to correct the discrepancies, no corrective action was ever taken by Intersect.

29.     Investigation into Intersect's activities revealed other illicit behavior was already underway.

30.     Specifically, a review of Intersect's reports revealed that beginning in December 2023, a staggeringly high number of chargebacks, totaling over 8,000, had supposedly been initiated by Querencia's clients seeking to reverse card payment transactions that were being processed by Intersect.

31.     Each of these chargebacks resulted in a "chargeback fee" of $175 being assessed by Intersect to Querencia, for a total amount of $1,400,000.00 in assessed fees.

32.     Given that such an extraordinarily high number of chargebacks in such a short span of time is essentially implausible absent some sort of interference, Querencia investigated these chargebacks by reaching out to its clients to confirm whether they had initiated these chargebacks, and if so, why.

33.     To Querencia's astonishment, its investigation revealed that contrary to the representations made by Intersect, many of Querencia's clients not only did not receive any reimbursement associated with the supposed chargebacks, but furthermore, many clients did not even initiate a chargeback and were unaware that

one had been initiated on their behalf in the first place.

34.     Ultimately, Querencia's investigation uncovered the existence of nearly 2,000 unexplained chargebacks that had been charged to Querencia but were otherwise unaccounted for in the records and reports.

35.     The chargeback fees assessed to each of these unexplained chargebacks, coupled with the dollar amounts of the fraudulent chargebacks themselves, collectively cost Querencia no less than $399,175, which upon information and belief was collected by Intersect and deposited into its own account.

36.     Intersect's own records further demonstrated that, on multiple occasions, it attached a unique Acquirer Reference Number ("ARN") to two different transactions.

37.     ARNs are unique 23-digit numbers linked to online VISA and Mastercard debit/credit card transactions between a merchant's bank (the "acquiring bank") and a cardholder's bank (the "issuing bank"), which are assigned only by VISA/Mastercard or the issuing bank and only when a transaction occurs via a payment gateway. As a result, a single ARN cannot be applied to multiple transactions.

38.     However, Intersect applied a single ARN to two different transactions on numerous occasions, allowing Intersect to levy two separate chargeback fees against Querencia from a single ARN code—*i.e.*, for a single chargeback. It bears

mentioning that such activity potentially constitutes a criminal offense in many jurisdictions, as an ARN is generated under a federal license.

39.    When confronted by Querencia, Intersect, through its principal and Director Bermudez, stated that unless and until Querencia's clients furnished a bank statement proving they did not receive a reimbursement from Intersect—an absurd demand out-of-step with industry practice—no further response would be provided.

40.    Furthermore, around May 2024, Querencia learned that Intersect's financial reports had inaccurately listed sums as unsettled due to purported "acquirer investigations" supposedly initiated by third-party banks, ultimately totaling just under half a million dollars. The unsettled periods and corresponding sums include:

(a) November 11-19, 2023: $37,341.35

(b) November 20-December 3, 2023: $17,264.00

(c) December 18-24, 2023: $4,783.99

(d) January 22-28, 2024: $232,656.76

(e) January 29-February 4, 2024: $334,499.76

(f) February 5-11, 2024: -$87,281.80

(g) February 26-March 3, 2024: -$23,554.28

(h) April 15-28, 2024: $762.80

41.    Importantly, these third-party banks included banks located in Mexico, revealing that contrary to the representations Bermudez, made at the outset of the

parties' relationship that Querencia's card payment transactions would be domestically processed by Intersect, Intersect was actually using third-party intermediaries located in Mexico (such as Feenicia) to process Querencia's card transactions.

42.    Querencia contacted these non-domestic banks that had supposedly initiated these investigations, each of which advised that they not only had no knowledge of any such investigations but also were not in possession of the designated funds inappropriately marked as unsettled. Querencia never received any documents or other materials from Intersect related to any bank regarding any such investigations, despite the common practice for banks to issue a formal letter to the merchant in these situations with details about the transaction and the resulting investigation.

43.    When Querencia confronted Intersect in January 2024 about the unsettled balances from 2023, McCrum, in his capacity as a principal and Director of Intersect, advised Querencia that the balances would be paid within six (6) months. No such payment was ever made.

44.    Further, Intersect, through its principal and Director Bermudez, told Querencia that it was in receipt of letters from a Mexican bank named Bankaool, S.A. supposedly stating that the unsettled funds were blocked there as part of the "acquirer investigations."

45.     However, after Querencia confronted Bermudez and told him that they had discussions with multiple representatives at Bankaool—none of whom were aware of any such issue—Bermudez contradicted himself by telling Querencia that the letters were actually from a different Mexican bank named Banca Afirme, S.A.B. Upon its review of these letters, Querencia noted that neither was specifically concerned with (nor addressed to) Querencia in any way, further calling into doubt the authenticity and veracity of the letters themselves.

46.     In addressing Querencia's concern that Intersect, contrary to the representations of Bermudez, was processing card transactions using third-party intermediaries located in Mexico, Intersect, through Bermudez, provided Querencia a document purporting to be an agreement between Feenicia and Querencia for processing services that assented to Feenicia's handling of the "investigations." Although the agreement appeared to have been signed by Fuchs, the document contained incorrect contact information for Fuchs, a forged incorrect signature of Fuchs, and the email address attached to Fuchs's signature was not only incorrect but belonged to a domain unrelated to Querencia. Indeed, Fuchs never signed any such document and never communicated with Feenicia in the first place. Review of the document also indicates that Feenicia's signature is likely also forged, and thus, it is probable that Feenicia is not even aware of the document's existence.

47.     Neither Intersect nor the Individual Defendants could explain to

Querencia how they came into possession of such a document, let alone why such a document would even exist in the first place. Moreover, Bermudez admitted in subsequent conversations that the document was created by Intersect to provide a direct link between Querencia and Feenicia, theoretically permitting Querencia to sue Feenicia directly for improperly handling Querencia's money and thereby (per Bermudez's intent) shifting the focus and responsibility away from Intersect.

48.    As Querencia's investigations continued, it also learned that Intersect had improperly aggregated multiple merchant identification numbers in processing transactions for Querencia. As a result, Querencia's card transaction settlements were delayed or otherwise tied up as the unknown merchants with which Querencia's card transactions had been aggregated were themselves subject to investigation.

49.    Further, in March 2024, Querencia became aware that $100,000 had been withheld from Querencia by Intersect purportedly as a result of two fines levied by VISA and Mastercard in February 2024.

50.    Querencia did not receive documentation to substantiate the assessment of these fines, despite its request for same and the standard practice of both VISA and Mastercard to issue form letters explaining the rationale for any such fine when relevant (and indeed, such letters would have contained invaluable details about the transactions at issue, including the merchant identification number with which the

transaction had been associated and the URL from which the transaction had been routed).

51.    Similarly, in July 2024, $50,000 was withheld from Querencia by Intersect allegedly as a result of another fine levied by VISA or Mastercard. Once again, Querencia did not receive any documentation to substantiate the assessment of this fine, nor did it received any letter from either VISA or Mastercard despite its request for same, thus indicating that no fine was ever truly assessed by either entity.

52.    Indeed, Intersect later admitted through its legal representative that it never received any letters regarding any such fines from either VISA or Mastercard.

53.    Not to be outdone, on multiple occasions, Intersect unilaterally and without warning both raised existing fees and imposed new fees either nonexistent in the parties' contract or expressly noted as being waived therein.

54.    Specifically, Intersect unilaterally doubled the rejection fee from $0.10 to $0.20, imposed a $0.10 SMS fee, assessed duplicate or otherwise unexplained transfer fees, and charged Querencia a "Gateway Maintenance Fee" that had been expressly waived in the contract. *See* Ex. A at 2.

55.    At the time of contracting, Intersect also induced Querencia into paying for a feature called Ethoca to be included with Intersect's payment processing services. Per McCrum, this feature consisted of a detailed dashboard that would allow Querencia to monitor the status of its funds, but none of the described

functions worked as initially represented to Querencia and, resultingly, did not help Querencia detect the various discrepancies detailed above.

56.    Following months of complaints from Querencia regarding all of the various foregoing issues, Intersect stated in June 2024 that it would not be able to pay out the $2 million in rolling reserves due in July.

57.    When Querencia confronted Intersect about its failure to remit the rolling reserve payout due, Intersect did not deny liability or otherwise claim that it did not owe the rolling reserve amounts to Querencia. On the contrary, Intersect acknowledged that it was their responsibility to make the payout, admitted that they were in the wrong by failing to make such payment, and promised that it would pay the rolling reserve amounts due to Querencia as soon as they were able. To this end, Intersect transferred $50,000 to Querencia as an advance on the remainder of the payment, which Intersect promised Querencia would be forthcoming. However, aside from that $50,000, it never paid the rolling reserve amounts owed to Querencia.

58.    Around this time, in early August 2024, Intersect suddenly stopped publishing financial reports for Querencia. Fuchs followed up with Intersect by reaching out to the individual charged with generating the reports, McCrum, who responded to Fuchs on August 8 by saying "the report should be out there" and once again blaming a "small bug" that was ostensibly preventing the reports from displaying on the online dashboard. When yet more days passed without any reports

being published, McCrum reassured Fuchs that he would "figure it out," but ultimately never took any steps to resolve the issue. Upon information and belief, this evasive behavior from McCrum was intended to obscure the scheme by which Intersect wrongfully sought to deprive Querencia of its own monies.

59.    Altogether, the above-described actions perpetrated by Defendants in furtherance of Intersect's (and their own individual) interests has proximately caused Querencia to suffer damages directly resulting from Defendants' activities in an amount not less than $3,119,704.31.

60.    Intersect's misconduct forced Querencia to retain another payment processor to assume the work of processing card payment transactions that Intersect had contracted to perform, which comprised roughly one-third of all of Querencia's transaction volume.

61.    Because the rolling reserves contained amounts that were ultimately due to be remitted back to Querencia from said reserves pursuant to the terms of the MSA, Intersect's actions forced Querencia to pay its merchants out of its own pocket to cover sums that should have been remitted from the reserves. This, in turn, wrongfully deprived Querencia of yet more of its own money, a direct result of Intersect's theft of Querencia's money with which it had been entrusted.

62.    Over time, Querencia came to learn that there were other clients of Intersect who had suffered from the same or similar issues. Moreover, messages

from Bermudez to Querencia in June 2024 indicated that Intersect intended to pay the monies owed to Querencia by transferring other clients' rolling reserve amounts to Querencia's rolling reserves (in other words, employing business practices tantamount to that of a Ponzi scheme).

63.    Querencia repeatedly made efforts to contact Defendants and resolve the above-described issues without resorting to legal action, giving Defendants the opportunity to return the funds belonging to Querencia, but to no avail.

64.    Defendants' misconduct has proximately caused Querencia's damages for Defendants' own pecuniary benefit.

65.    All conditions precedent to the filing of this action have been satisfied, waived, or have occurred.

66.    Querencia has retained the law firm of Greenspoon Marder LLP to represent it in this action and is obligated to pay reasonable attorneys' fees and costs incurred herein.  Querencia seeks recovery of its reasonable and necessary attorneys' fees and costs from Defendants.

## COUNT I
## FRAUD
### (against all Defendants)

67.    Querencia realleges and reincorporates the allegations contained in paragraphs 1 through 66 above as if more fully set forth herein.

68.    This is a cause of action for fraud against all Defendants for damages

in excess of $75,000 and otherwise subject to the Court's diversity jurisdiction.

69.     As alleged herein, Defendants knowingly made false statements concerning material facts before and during the parties' relationship in order to induce Querencia to enter into, and maintain, a contractual relationship with Intersect, including but not limited to:[1]

(a) Bermudez stating to Fuchs, on November 15, 2023, that transactions processed on Querencia's behalf would be processed by Intersect itself domestically and without the use of third-party intermediaries;

(b) Bermudez stating to Fuchs, on February 12, 2024, that the lowered amounts reflected in the transaction reports were the result of a system error and/or had not been manipulated by Intersect;

(c) Bermudez stating to Fuchs, on February 16, 2024, that the thousands of chargebacks and the accompanying fees assessed to Querencia were all authentic;

(d) Bermudez stating to Fuchs, on September 11, 2024, that hundreds of thousands of dollars of Querencia's monies were tied up in "acquirer investigations" initiated by third-party banks;

(e) Bermudez stating to Fuchs, on August 18, 2024, a falsified, forged document purportedly signed by Fuchs assenting to the third-party bank's handling of the "investigations"; and,

(f) Bermudez stating to Fuchs, on July 16, 2024, that Querencia had been fined by VISA and Mastercard for a total of $150,000 that was otherwise unsubstantiated;

70.     The statements of Defendants outlined in part above and throughout

---

[1] This enumeration is not intended to be exhaustive, and additional false and misleading statements for which Querencia will seek relief herein are expected to be identified by continuing investigation and through discovery.

this Complaint, are not only false, but also misleading when considered in their full context.

71.    Defendants were aware of the falsity and misleading nature of these statements and conduct at the time each was made to Querencia and intended Querencia to rely on such statements and conduct.

72.    Specifically, the purpose of such statements and conduct was to obtain Querencia's business and then to keep Querencia's business in spite of the host of issues that Querencia subsequently identified, and therefore plainly had a material effect on Querencia's business decisions.

73.    In reasonable reliance on these representations and conduct, Querencia entered into and continued to perform under the MSA that Defendants used as a means to siphon away millions of dollars of Querencia's money.

74.    As a direct and proximate result, Querencia has been damaged in an amount totaling over $3 million.

**WHEREFORE**, Querencia respectfully requests that this Court enter a judgment against Defendants, awarding Querencia damages, including pre- and post-judgment interest, together with its attorney's fees and the costs incurred, and for such other and further relief as this Court may deem just and proper.

<u>**COUNT II**</u>
**BREACH OF CONTRACT**
(against Intersect)

75.    Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 66 above as if more fully set forth herein.

76.    This is a cause of action for breach of contract against Intersect for damages in excess of $75,000 and otherwise subject to the Court's diversity jurisdiction.

77.    A valid contract, the MSA, was executed between Querencia and Intersect on November 13, 2023. *See* Ex. A.

78.    Intersect subsequently materially breached the terms of the MSA in a litany of ways, including but not limited to: [2]

(a) Failing to reimburse Querencia the monies owed to it from the rolling reserve;

(b) Artificially manipulating the amounts in the rolling reserve to improperly lower the amounts remitted to Querencia therefrom;

(c) Unilaterally altering the costs and fees associated with transactions processed by Intersect;

(d) Improperly assessing multiple fees for a single chargeback on numerous occasions;

(e) Failing to disclose the use of Mexican acquirers;

(f) Falsifying documentation, ranging from transaction reports to bank letters, for Intersect's own pecuniary gain; and,

(g) Assessing fees not provided for by the contract;

---

[2] This enumeration is not intended to be exhaustive, and additional infractions for which Querencia will seek relief herein are expected to be identified by continuing investigation and through discovery.

79.    As a direct and proximate result of Intersect's breach of the terms of the MSA, Querencia suffered damages totaling over $3 million.

**WHEREFORE**, Querencia respectfully requests that this Court enter a judgment against Defendants, awarding Querencia damages, including pre- and post-judgment interest, together with its attorney's fees and costs incurred, and for such other and further relief as this Court may deem just and proper.

<u>**COUNT III**</u>
**UNJUST ENRICHMENT**
(against Intersect)

80.    Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 66 above as if more fully set forth herein.

81.    As part of the card payment processing services that Intersect agreed to provide for Querencia, Intersect processed millions of dollars' worth of transactions on Querencia's behalf. By the nature of this arrangement, Intersect withheld millions of dollars' worth of monies owed to Querencia.

82.    These monies (and others) constitute a benefit that Querencia has conferred upon Intersect through the temporary relinquishment of such monies, which Intersect voluntarily accepted and retained.

83.    As the foregoing circumstances described in this Complaint make clear, it would be grossly inequitable for Intersect to retain such benefit without remitting the value thereof back to Querencia.

**WHEREFORE**, Querencia respectfully requests that this Court enter a judgment against Defendants, awarding Querencia damages, including pre- and post-judgment interest, together with its attorney's fees and costs, and for such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Querencia hereby demands a jury trial on all issues so triable.

Dated: March 3, 2025.        Respectfully submitted,

By: */s/ Steven J. Fonseca*
Lawren A. Zann
Florida Bar No. 42997
lawren.zann@gmlaw.com
gabby.mangar@gmlaw.com
Steven J. Fonseca
Florida Bar No. 1051058
steven.fonseca@gmlaw.com
gabby.mangar@gmlaw.com
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, Florida 33301
Telephone: (954) 491-1120
Facsimile: (954) 343-6958

*Counsel for Querencia Technologies Pte. Ltd.*